# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT
_____

NORTHERN BOTTLING CO., INC.

*Plaintiff-Appellant*,

VS.

PEPSICO, INC.

*Defendant-Appellee.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF NORTH DAKOTA
CASE NO. 4:15-CV-133
_____

## MOTION OF PEPSI-COLA BOTTLERS' ASSOCIATION
## FOR LEAVE TO FILE AMICUS CURIAE BRIEF IN SUPPORT OF
## PLAINTIFF-APPELLANT NORTHERN BOTTLING
_____

Marcia V. Andrew
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Telephone:  (513) 381-2838
Fax:  (513) 381-0205
andrew@taftlaw.com

COUNSEL FOR AMICUS CURIAE
PEPSI-COLA BOTTLERS' ASSOCIATION

The Pepsi-Cola Bottlers' Association ("PCBA"), respectfully requests leave to file an *amicus curiae* brief, in accordance with Fed. R. App. Pro. 29(a). PCBA seeks to support Plaintiff-Appellant, Northern Bottling Co., Inc. ("Northern") and urge reversal of the summary judgment entered on behalf of Defendant PepsiCo, Inc. ("PepsiCo"), in order to preserve a fundamental promise in the Exclusive Bottling Appointments of all US Pepsi-Cola bottlers—that PepsiCo has a duty to protect its US bottler's exclusive territories from invasion. An *amicus curiae* brief is desirable because the issue of the interpretation of PepsiCo's duties under the Exclusive Bottling Appointments has importance beyond the interests of the parties, and the PCBA offers a historical industry perspective that will ensure complete and plenary presentation of the issues so the Court may reach a proper decision.

The PCBA is a non-profit corporation that has represented U.S. Pepsi-Cola bottlers for decades. Its current membership consists of 36 US Pepsi-Cola bottlers, including the four largest. Independent Pepsi bottlers are responsible for approximately 24% of PepsiCo's U.S. beverage business. The independent Pepsi bottlers have annual revenue of approximately $4 billion and employ over 25,000 employees. The PCBA seeks to protect its members' interests from being damaged as a result of this dispute between a small bottler and PepsiCo over fundamental franchise rights which have been granted to each of the independent Pepsi bottlers.

The District Court held that PepsiCo has no duty, either express or implied through the Exclusive Bottling Appointments, to protect Northern's exclusive territory from invasion by third parties acting without authorization from Pepsi to distribute Pepsi products in Northern's territory. This Order destroys a core principle of the Pepsi-Cola franchised bottler system—that each bottler is granted the exclusive and protected right to bottle, sell, and distribute Pepsi in a defined geographic territory. PepsiCo grants its bottlers exclusive territories through Exclusive Bottling Appointments. Northern's Exclusive Bottling Appointment, like those of all other independent bottlers, provides,

> Pepsi-Cola Company … hereby appoints … Northern Bottling Co. … herein called Bottler, as its exclusive bottler, to bottle and distribute the carbonated beverage known as 'Pepsi-Cola' in the following described territory … and nowhere else …

DC-ECF Doc. 1-1 (Add. 23-26).[1] All independent Pepsi bottlers have exclusive territories granted to them by PepsiCo in substantially identical Exclusive Bottling Appointments.

The PCBA's proposed *amicus curiae* brief is relevant because it demonstrates that PepsiCo, through its words and actions over decades, has acknowledged that the Exclusive Bottling Appointments contain a duty to protect its bottlers' exclusive territories from invasion by itself, other bottlers, and third-

---

[1] All record citations will use the format and abbreviations used in Appellant's principal brief, Entry ID: 4908392.

parties. This invasion, which is called "transshipment" in the beverage industry, occurs when product produced for sale in one bottler's territory is transported, either directly by the source bottler or indirectly by a third party, for sale in another bottler's territory. DC-ECF Doc.74, p. 2 (App. 24).

From the 1930's through the present, PepsiCo has issued Exclusive Bottling Appointments to every bottler in the United States. Each bottler holds an Exclusive Bottling Appointment for brand Pepsi-Cola and separate Exclusive Bottling Appointments for other brands. These agreements authorize bottlers to bottle and distribute a licensed beverage in a defined exclusive territory, and prohibit bottlers from bottling and distributing the licensed beverage—either directly or indirectly—outside of their exclusive territory. For almost a century, PepsiCo has promised bottlers that it will protect their exclusive territories by enforcing the territorial restrictions in all Exclusive Bottling Appointments.

When PepsiCo attempted to terminate an independent bottler, the United States District Court for the Southern District of Ohio found that, "for the better part of the 20th century, PepsiCo's business was founded on the notion that the best way to sell its product was through the granting of exclusive territories to independent, family-owned bottlers . . . Through the years, PepsiCo has encouraged its independent bottlers to continue to invest in their bottling operations based on the exclusivity of their territories." *PepsiCo, Inc. v. Cent. Inv.*

*Corp. Inc.,* 268 F. Supp.2d 962, 969 (S.D. Ohio 2001).

Individually, bottlers have invested tens or hundreds of millions of dollars in reliance on their Exclusive Bottling Appointments to build, expand, and modernize manufacturing and warehouse facilities, to purchase trucks, vendors, and other equipment to distribute Pepsi branded beverages, and for local advertising and promotions to build and increase the market for Pepsi branded beverages, all in reliance on the fundamental principle of exclusive, protected territories. Certain bottlers, including Northern, formed and invested in manufacturing cooperatives mutually owned with other bottlers. In aggregate, bottlers have invested billions of dollars. Pepsi bottlers would not have made these investments in their businesses if their "exclusive" territories could be invaded without recourse.

Independent Pepsi bottlers are primarily family-owned businesses, who have for generations invested in their businesses and aggressively promoted Pepsi beverages to "fully meet and increase the demand for Pepsi-Cola throughout the Territory and secure full distribution up to the maximum sales potential therein" as required by their Exclusive Bottling Appointments. *See* DC-ECF Doc. 1-1, Northern EBA, ¶ 8. These family-owned businesses form part of the fabric of their communities, providing jobs and supporting local charitable and civic causes.

This Court should interpret Fed. R. App. P. 29 broadly and err on the side of granting leave. *Neonatology Assocs., P.A. v. Comm'r of Internal Revenue,* 293

F.3d 128, 133 (3rd Cir. 2002). The PCBA's attached amicus brief meets the criteria of Rule 29 by providing background as to Pepsi's exclusive territory bottling system and PepsiCo's duty to protect those exclusive territories that has direct relevance to the issues on appeal. The brief is relevant because it addresses matters critical to the proper interpretation of PepsiCo's Exclusive Bottling Appointments, explains the purpose of the Exclusive Bottling Appointments and the surrounding circumstances, the parties' mutual understanding, usage, and intent with respect to PepsiCo's duty to protect the exclusive territories it granted, and informs the Court why it may consider this information in ruling on this appeal.

An *amicus curiae* brief is desirable because Northern's Exclusive Bottling Appointment is substantially similar to the Exclusive Bottling Appointment's of every member of the PCBA. Each contain the same exclusivity and territorial restrictions that give rise to PepsiCo's duty to protect against invasion by PepsiCo's own bottling operations ("PBC"), other bottlers, and third-parties. This Court's decision on this issue will potentially impact the contract rights and franchise equity of all independent Pepsi-Cola bottlers in the U.S.

A copy of the proposed brief accompanies this motion and is incorporated by reference as if fully restated herein.

Respectfully submitted,

Taft Stettinius & Hollister LLP

/s/ Marcia V. Andrew
Marcia V. Andrew
425 Walnut Street, Suite 1800
Cincinnati, Ohio 45202
Tel: (513) 381-2838
andrew@taftlaw.com

Attorneys for amicus curiae
Pepsi-Cola Bottlers' Association

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the Motion of the of the Pepsi-Cola Bottlers' Association For Leave to File Amicus Curiae Brief in Support of Northern Bottling Co., Inc. was served upon counsel of record on May 7, 2020, via the Court's ECF system, which will send an electronic copy to all counsel of record.

/s/ Marcia V. Andrew
Marcia V. Andrew

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE EIGHTH CIRCUIT
_____

NORTHERN BOTTLING CO., INC.

*Plaintiff-Appellant*,

VS.

PEPSICO, INC.

*Defendant-Appellee.*
_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR

THE DISTRICT OF NORTH DAKOTA

CASE NO. 4:15-CV-133

## BRIEF OF AMICUS CURIAE
## PEPSI-COLA BOTTLERS' ASSOCIATION
## IN SUPPORT OF PLAINTIFF-APPELLANT NORTHERN BOTTLING
## URGING REVERSAL

Marcia V. Andrew
Taft, Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Telephone: (513) 381-2838
Fax: (513) 381-0205
andrew@taftlaw.com

COUNSEL FOR AMICUS CURIAE
PEPSI-COLA BOTTLERS' ASSOCIATION

## CORPORATE DISCLOSURE STATEMENT

Amicus Curiae Pepsi-Cola Bottlers' Association, pursuant to Fed. R. App. P. 26.1 and 29(a), and 8th Cir. R. 26.1A, states it has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

27197420.1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.....................................................................................iii

STATEMENT OF IDENTITY....................................................................................1

INTRODUCTION.......................................................................................................5

ARGUMENT............................................................................................................12

    I.      The District Court Erred In Determining
            That The EBA Was Ambiguous Despite
            Multiple Possible Meanings And Without
            Considering The Customs, Practices, Usages
            And Terminology Of The Soft Drink Bottling Industry....................12

    II.     The District Court Erred By Refusing To
            Consider Extrinsic Evidence To Determine
            The Meaning of the Ambiguous Exclusive BAs.................................19

    III.    The District Court Erred In Rejecting
            Northern's Claim of Breach of the Implied
            Covenant of Good Faith and Fair Dealing
            Without Trial....................................................................................23

CONCLUSION.........................................................................................................28

CERTIFICATE OF COMPLIANCE.........................................................................29

CERTIFICATE OF VIRUS FREE.............................................................................30

CERTIFICATE OF SERVICE..................................................................................31

27197420.1

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Bank of China v. Chan*,
937 F.2d 780 (2d Cir. 1991) ...............................................................................26

*British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*,
342 F.3d 78 (2d Cir. 2003) ...........................................................................13, 17

*Broder v. Cablevision Sys. Corp.*,
418 F.3d 187 (2d Cir. 2005) ...............................................................................13

*Carvel Corp. v. Diversified Mgmt. Grp. Inc.*,
930 F.2d 228 (2d Cir. 1991) ...............................................................................23

*Chapman v. N.Y. State Div. for Youth*,
546 F.3d 230 (2d Cir. 2008) ...............................................................................17

*Coca-Cola Co. v. F.T.C.*,
642 F.2d 1387 (D. D.C. 1981) ...............................................................................9

*Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*,
650 F. Supp. 2d 314 (S.D.N.Y. 2009) .............................................15, 16, 24, 25

*Cross & Cross Props. v. Everett Allied Co.*,
886 F.2d 497 (2d Cir. 1989) ...............................................................................24

*Dalton v. Educ. Testing Serv.*,
663 N.E.2d 289 (N.Y. 1995)..........................................................................22, 23

*Don King Prod., Inc. v. Douglas*,
742 F. Supp. 741 (S.D.N.Y. 1990) ........................................................23, 24, 26

*Eastside Vend Distribs., Inc. v. Pepsi Bottling Grp. Inc.*,
396 Md. 219, 913 A.2d 50 (Md. 2006)................................................................11

*FCCD Ltd. v. State St. Bank & Trust Co.*,
No. 10 Civ. 1632 (DLC), 2011 WL 519228 (S.D.N.Y. Feb. 15,
2011) ....................................................................................................................18

*Geren v. Quantum Chem. Corp.*,
    832 F. Supp. 728 (S.D.N.Y. 1993), *aff'd*, 99 F.3d 401 (2d Cir.
    1995) ...................................................................................................23

*Int'l Multifoods Corp. v. Commercial Union Ins. Co.*,
    309 F.3d 76 (2d Cir. 2002) ...............................................................18

*Kerin v. U.S. Postal Serv.*,
    116 F.3d 988 (2d Cir.1997) ...............................................................17

*Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*,
    595 F.3d 458 (2d Cir. 2010) ..............................................13, 18, 21

*In re Matter of The Coca-Cola Co.*,
    91 F.T.C. 517, 1978 WL 206107 (1978) ............................................8

*In re Matter of PepsiCo, Inc.*,
    91 F.T.C. 680, 1978 WL 206095 (1978) ............................................8

*Morgan Stanley Grp., Inc. v. New Eng. Ins. Co.*,
    225 F.3d 270 (2d Cir. 2000) ........................................................13, 14

*Pamado, Inc. v. Hedinger Brands, LLC*,
    785 F.Supp.2d 698 (N.D. Ill. 2011)...................................................20

*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*,
    431 F.3d 1241 (10th Cir. 2005) .................................................*passim*

*Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*,
    754 F.2d 10 (1st Cir. 1985)................................................................11

*PepsiCo, Inc. v. Cent. Inv. Corp., Inc.*,
    268 F.Supp.2d 962 (S.D. Ohio 2001) ...............................................23

*PepsiCo, Inc. v. Central Inv. Corp.*,
    *268 F. Supp. 2d 963 (S.D. Ohio 2001)* .........................................2, 3

*PepsiCo, Inc. v Fritz Bottling Company, Inc.*,
    U.S. District Court, D. Arizona, 8/13/93 ..................................7, 8, 26

*PepsiCo, Inc. v. Marion Pepsi-Cola Bottling Co.*
    (N.D. Ill. Complaint, June 14, 1999) .................................................23

iv

*PepsiCo., Inc. v. Cent. Inv. Corp.*,
271 F.Supp. 2d 1040 (S.D. Ohio 2001) ............................................................23

*Scheck v. Burger King Corp.*,
756 F.Supp. 543 (S.D. Fla. 1991) ......................................................................27

*Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*,
762 F.3d 165 (2d Cir. 2014) ........................................................................17, 18

*William C. Atwater & Co., Inc. v. Panama R. Co.*,
246 N.Y. 519, 159 N.E. 418 (N.Y. 1927)....................................................18, 19

*Witherspoon v. Rappaport*,
65 Fed. App'x 356 (2d Cir. 2003) ......................................................................25

*World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*,
345 F.3d 154 (2d Cir. 2003) ...............................................................................13

*Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*,
836 F.2d 173 (3rd Cir. 1988) .............................................................................11

**Statutes**

15 USC § 3502.........................................................................................................5

Act .........................................................................................................................10

FTC Act Section 5...................................................................................................9

N.Y. U.C.C. §1-304 ..............................................................................................22

New York UCC......................................................................................................22

Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501 ...................................10

UCC........................................................................................................................22

Uniform Commercial Code......................................................................................4

**Other Authorities**

Fed. R. App. P. 29 ...................................................................................................1

Fed. R. App. Pro. 29(a)(2) ......................................................................................2

Securities and Exchange Commission
   http://sec.gov/Archives/edgar/data ......................................................................4

27197420.1

## IDENTITY, AUTHORITY AND INTEREST OF THE AMICUS CURIAE

The Pepsi-Cola Bottlers' Association ("PCBA") is a non-profit corporation that has represented U.S. Pepsi-Cola bottlers for decades.[1] Its membership consists of 36 U.S. Pepsi-Cola bottlers, including the four largest. The PCBA's purpose, as stated in its bylaws, is to build and protect the franchise equity of its members in the manufacture, sale, and distribution of Pepsi-Cola products. There are a total of 87 independent Pepsi bottlers in the U.S. who collectively are responsible for approximately 24% of Pepsi Cola Company's ("PepsiCo") U.S. beverage business. Pepsi bottlers have annual revenue of approximately $4 billion and employ over 25,000 employees.

The PCBA files this brief under Fed. R. App. P. 29. The PCBA supports the position of Plaintiff-Appellant Northern Bottling, Inc. ("Northern") and urges reversal of the summary judgment granted to Defendant PepsiCo, Inc. ("PepsiCo") on Northern's claims for breach of contract and breach of the implied covenant of good faith and fair dealing. The PCBA does not take a position on Northern's tort law claims.

---

[1] The PCBA's counsel, as identified on the cover, authored this amicus brief in whole. Neither party to this appeal or their counsel contributed money that was intended to fund the preparation of this amicus brief. No person—other than the amicus curiae, its members, or its counsel—contributed money that was intended to fund the preparation of this amicus brief.

The PCBA sought consent to file this brief, pursuant to Fed. R. App. Pro. 29(a)(2). Northern consented, but PepsiCo refused. By the accompanying motion, the PCBA requests leave to file this brief.

The District Court's summary judgment in favor of PepsiCo invalidates a core principle of the Pepsi-Cola independent bottler system – that each bottler is granted the exclusive and protected right to bottle, sell and distribute Pepsi in a defined geographic territory. PepsiCo grants its bottlers exclusive territories through Exclusive Bottling Appointments ("EBAs" or "Exclusive BAs").

The grant of exclusive, perpetual territories benefitted both PepsiCo and its independent bottlers. "[F]or the better part of the 20th century, PepsiCo's business was founded on the notion that the best way to sell its product was through the granting of exclusive territories to independent, family-owned bottlers . . . Through the years, PepsiCo has encouraged its independent bottlers to continue to invest in their bottling operations based on the exclusivity of their territories." *PepsiCo, Inc. v. Central Inv. Corp., 268 F. Supp. 2d 963, 969 (S.D. Ohio 2001).*

The District Court determined that PepsiCo has no duty, either expressly in the contracts or through the implied duty of good faith and fair dealing, to protect the exclusive territory it granted Northern from invasion by third parties selling and distributing Pepsi products without authority. This erroneous decision impacts each of the members of the PCBA and the IBA, as they all have nearly identical Exclusive

2

BAs with PepsiCo. The decision also conflicts with the decision of the U.S. Court of Appeals for the Tenth Circuit in *Pittsburg Pepsi*, which held that PepsiCo does have a duty to take reasonable steps to protect its exclusive bottlers from territorial invasion.

If not reversed, the lower court ruling will (i) undermine a core principle of PepsiCo's bottling franchises that has endured for almost a century; (ii) create different contractual standards for bottlers in different jurisdictions who operate under identical contracts; and (iii) jeopardize billions of dollars of U.S. bottler investments.

As PepsiCo encouraged (*PepsiCo, Inc. v. Central Inv. Corp.*, 268 F.Supp.2d at 969), U.S. Bottlers have spent billions of dollars to build, expand, and modernize manufacturing and warehouse facilities, to purchase trucks, vendors, and other equipment to distribute the beverages, and to form manufacturing co-ops. As the industry consolidated, U.S. Bottlers have paid tens or hundreds of millions of dollars to acquire other Pepsi bottlers' businesses. Pepsi bottlers would not have made these investments in "exclusive" territories that could be invaded without recourse by unauthorized distributors.

27197420.1

Independent Pepsi bottlers are primarily family-owned businesses, who have for generations invested in their businesses[2] and aggressively promoted Pepsi beverages to "fully meet and increase the demand for Pepsi-Cola throughout the Territory and secure full distribution up to the maximum sales potential therein" as required by their EBAs. *See* DC-ECF Doc. 1-1, Northern EBA ¶ 8. These businesses form part of the fabric of their communities, providing jobs and supporting local charitable and civic causes.

As amicus curiae, the PCBA's interest is to protect the core contract rights of its members. It urges this Court to correct the District Court's misapplication of New York law concerning the meaning of the exclusivity language in the Exclusive BAs. The PCBA concurs with Northern's position that the Exclusive BAs are governed by New York's Uniform Commercial Code.

In this brief, the PCBA explains that even if New York common law controls, the decision should be reversed, because the District Court erred in deciding, without analysis and contrary to New York state precedent, that the Exclusive BAs are not ambiguous as to the meaning of the exclusivity provisions. As it is settled law that extrinsic evidence is admissible to determine the meaning of an ambiguous contract,

---

[2] PepsiAmericas ("PAS") paid $354.6 million to acquire a bottler in January 2005. PAS' 2005 Form 10K, publicly filed with the Securities and Exchange Commission http://sec.gov/Archives/edgar/data.

the lower court erred in refusing to consider PepsiCo's own words and actions over decades which demonstrate the parties' understanding that the exclusivity language of the EBAs includes a promise by PepsiCo to protect the exclusive territories from invasion by unauthorized distribution.

## INTRODUCTION AND HISTORICAL BACKGROUND

The concept of invasion of exclusive territories by "transshipment" is central to this dispute. "Transshipment" or "invasion" in the beverage industry occurs when product produced for sale in one bottler's territory is transported, either directly by the source bottler or indirectly by a third party, for sale in another bottler's territory. DC-ECF Doc. 74, p. 2 (App.24). Stated another way, transshipment is the unauthorized distribution of licensed beverage product into a bottler's exclusive territory. Invasion by unauthorized distribution – whether by another Pepsi bottler, a third party, or PepsiCo itself through its own bottling operations known as PBC, is a threat to PepsiCo's system of independent bottlers with exclusive, protected territories.

Bottlers depend on PepsiCo, as licensor, to protect their exclusive territories because they have a limited ability to protect their exclusive territories themselves. Bottlers may not agree with an adjoining bottler to prevent unauthorized distribution. Such agreements would involve enormous antitrust risk. *See* 15 USC § 3502.

27197420.1

Bottlers have limited recourse against third-party transshippers who typically owe no contractual duty to the invaded bottler to limit their sales.

The District Court's decision is founded on the erroneous conclusion that, because the word "transshipment" is not present in the Exclusive BAs, PepsiCo cannot have any duty with to protect "it's exclusive bottler[s]" from invasion of their territories by unauthorized distribution (i.e., transshipment). However, Northern presented substantial evidence of course of dealing and custom and trade that demonstrates that the concept of exclusive territories is inextricably linked with protection from invasion by unauthorized distribution. The failure of the District Court to consider this evidence threatens to work an injustice on all 87 independent Pepsi bottlers.

PepsiCo has historically viewed the Exclusive BA, and specifically its grants of exclusive territories to its independent bottlers, as the core of its overall business structure. In his August 14, 1975, sworn testimony before the Federal Trade Commission, former PepsiCo President Walter S. Mack discussed how PepsiCo used the promise of exclusivity to persuade independent businessmen to become PepsiCo bottlers:

> [W]e had to give them confidence in the early days that we were going to win our trademark suits and that they were taking on a beverage which they would have the exclusive right to from then on for the rest of their lives … [We told the bottlers] that the parent company would protect their franchise, the terms and conditions of the franchise, and

6

do everything we could to protect both the trademark and the name and their territory for them on an exclusive basis.

*Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1249

(10th Cir. 2005).

PepsiCo confirmed the critical importance of exclusive territories to its

distribution system in a Complaint that it filed in 1993 in the United States District

Court for the District of Arizona against two independent Pepsi-Cola bottlers when

they materially breached their Exclusive BAs by selling Pepsi soft drinks outside

their exclusive territories, both directly and indirectly. PepsiCo described its system

of exclusive, protected territories as follows:

> Exclusive territories have been historically, and continue to be, at the heart of PepsiCo's system of distribution. ***Exclusive territories are essential to the mutual objectives of PepsiCo and its bottlers*** . . .
>
> DC-ECF Doc. 96-3, Complaint ¶ 15, *PepsiCo, Inc. v Fritz Bottling Company,*

*Inc.*, U.S. District Court, D. Arizona, 8/13/93 (emphasis added).

PepsiCo explained to the Arizona District Court the meaning of PepsiCo's

grant of an exclusive territory through Exclusive Bottling Appointments:

> To ***protect*** the bottler's continuing investment and to encourage the bottler to fully develop its business, PepsiCo appoints each bottler to an exclusive territory to the ***exclusion of all other bottlers*** and, except for certain national syrup accounts, ***protects the bottler from competition from PepsiCo itself***. Each PepsiCo bottler in the United States and throughout the world enjoys these ***same benefits and protections under the terms of its exclusive bottling appointment***.

Id., Complaint ¶ 14, *Fritz Bottling*, (emphasis added).

7

PepsiCo claimed in *Fritz Bottling* that the defendant bottlers tortiously interfered with the Exclusive BAs between PepsiCo and the invaded bottlers, restating that it had granted each such bottler "***a protected and exclusive territory*** . . . and the exclusive rights to make initial sales of PepsiCo products within their territories," and that, ***as a result of the transshipment by defendant bottlers, the invaded bottlers "did not receive an exclusive territory."*** Id., Complaint ¶¶ 68, 71, *Fritz*, (emphasis added). Thus PepsiCo, in its own words, tied the concept of exclusive territory to protection from transshipment.

PepsiCo aggressively defended its system of exclusive, protected territories to the Federal Trade Commission and the U.S. Congress. On July 15, 1971, the FTC issued separate complaints against Coca-Cola, PepsiCo, and other soft drink concentrate companies.[3] These complaints challenged the territorial restrictions in bottling appointments as improperly lessening intrabrand competition.

The FTC proceeding was predicated on PepsiCo's shared understanding with its bottlers that the "and nowhere else" clause restricted the bottler from selling directly or through third parties to retailers or customers outside the bottler's assigned territory. *In re Matter of PepsiCo, Inc.*, 91 F.T.C. 680, 1978 WL 206095,

---

[3] *See In re Matter of The Coca-Cola Co.*, 91 F.T.C. 517, 1978 WL 206107 (1978) and *In re Matter of PepsiCo, Inc.*, 91 F.T.C. 680, 1978 WL 206095 (1978) for a recitation of the complaints.

at *14-15 (1978) ("The bottlers testified that they do not engage in such [extraterritorial] sales or shipments, and if they did, it would constitute a breach of the territorial provisions of their bottling appointment agreements. [ ] PepsiCo has imposed, by contract, and enforced, in practice, geographic exclusivity, using such methods as may have been necessary to preserve the territorial restrictions challenged in this proceeding."). The FTC did not challenge PepsiCo's grant of exclusivity—PepsiCo's appointment of each bottler "as its exclusive Bottler." But the FTC determined that the territorial restrictions "eliminated virtually all intrabrand competition" and were unlawful under Section 5 of the FTC Act. *Coca-Cola Co. v. F.T.C.*, 642 F.2d 1387, 1388 (D. D.C. 1981).

The soft drink industry responded by seeking federal legislation to preserve the long history of territorial restrictions in the industry. PepsiCo informed Congress, and later the courts, that its promise of territorial exclusivity is meaningless—and its EBAs worthless—unless PepsiCo restricts bottler and third party transshipments. PepsiCo so advised the United States Senate Judiciary Committee in 1972.

> [FTC counsel] seek to have their cake and eat it too by suggesting on the one hand that exclusive representation is not being questioned and on the other praying for an order which would forbid the inclusion by the franchisor in its franchise agreements of any limitation on the location of the franchisees' selling or distribution outlets. ***An exclusive without such restriction is a contradiction in terms.*** PepsiCo Memorandum to Judiciary Committee, Hearings on Exclusive Territorial Allocation Legislation, DC-ECF Doc. 108, Ex.C. (emphasis added).

> Yet, if there are no territorial restrictions on other franchisees, there is no effective way to protect against the other franchisees' invading an exclusive territory and depriving the exclusive distributor of a substantial portion of his business. Id. at 24-25.

In 1980, Congress passed the Soft Drink Interbrand Competition Act, 15 U.S.C. § 3501 (the "Act"). The Act authorizes the "enforcement" of provisions "limiting the licensee [bottler], ***directly or indirectly***, to the manufacture, distribution, and sale of [soft drink] product only for ***ultimate resale to consumers*** within a defined geographic area…." (emphasis added). A ruling that PepsiCo has no duty to prevent transshipment would allow PepsiCo to render meaningless the protection PepsiCo successfully persuaded Congress to permit it to extend to soft drink bottlers.

Following passage of this Act, John Sculley, CEO, wrote to all U.S. Bottlers. DC-ECF Doc. 96-2, (Add. 27-28). Mr. Sculley reaffirmed that "store-door delivery and full development of each territory are the hallmark and backbone of our enterprise." He explained the significance of the Act:

> In order to avoid any misunderstanding as to our position, the territorial exclusivity and territorial restrictions which have been validated by this statute will be vigorously enforced by employing any and all remedies at our disposal, including cancellation and termination in appropriate cases. <u>You may not under any circumstances directly or indirectly sell product for ultimate resale outside your territory.</u>  Id. (emphasis in original).

Through this letter, PepsiCo made clear that it would "vigorously enforce" the territorial restrictions against unauthorized sales in order to protect the territorial

10

exclusivity PepsiCo has granted to "its exclusive Bottlers." Exclusivity was linked to the right to the absence of unauthorized sales and distribution.

Since July 1980, PepsiCo has taken numerous steps to enforce the territorial restrictions as to bottler and third-party transshipments. Each bottler must code each produced item so that diverted product may be traced. PepsiCo expects its bottlers to limit quantities or discontinue sales to third parties who transship. *See Pepsi-Cola Metro. Bottling Co. v. Checkers, Inc.*, 754 F.2d 10 (1st Cir. 1985) (bottler practice upheld of limiting sales to retailer to quantity retailer could reasonably sell to local customers); *Eastside Vend Distribs., Inc. v. Pepsi Bottling Grp. Inc.*, 396 Md. 219, 913 A.2d 50, 56 (Md. 2006) (bottler included in customer agreement prohibition against customer reselling the Pepsi products to other resellers/distributors, intended to prevent transshipment).

PepsiCo has also successfully defended territorial exclusivity in court proceedings. *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173 (3rd Cir. 1988). PepsiCo explained to the Third Circuit why it must prevent third-party transshipments. PepsiCo admitted in its brief in *Zimmerman* that "territorial restrictions would be of little practical value if they could be circumvented by the simple device of third-party transshipping." Exhibit E.

Following unsuccessful attempts to consolidate its bottling network (*see Pittsburg Pepsi*, 431 F.3d 1241, 1250-52 (10th Cir. 2005), PepsiCo in 2010

11

purchased the remaining shares it did not own of its two largest bottlers, creating the wholly-owned subsidiary Pepsi Beverages Company ("PBC"). PepsiCo now distributes and sells PepsiCo products through PBC. DC-ECF Doc. 88, p.10. PBC accounts for 75-80% of United States PepsiCo carbonated soft drink ("CSD") sales and independent bottlers now account for 20-25% of such sales. *Id*.

The territorial invasion at issue in this case is the distribution of Pepsi products manufactured by PBC into Northern's exclusive territory by third parties. DC-ECF. Doc.74, p.10. This is referred to by the parties as indirect transshipment, as the producing bottler did not sell into Northern's territory, but one or more intermediate sales resulted in the product ultimately crossing into Northern's territory.

## **ARGUMENT**

I.  **THE DISTRICT COURT ERRED IN DETERMINING THAT THE EBA WAS UNAMBIGUOUS DESPITE MULTIPLE POSSIBLE MEANINGS AND WITHOUT CONSIDERING THE CUSTOMS, PRACTICES, USAGES AND TERMINOLOGY OF THE SOFT DRINK BOTTLING INDUSTRY.**

A.    New York Law Holds That a Contract Is Ambiguous If Its Terms Suggest More Than One Meaning When Viewed Objectively By A Reasonably Intelligent Person Who Has Examined The Context of the Entire Integrated Agreement and Who Is Cognizant of the Customs, Practices, Usages and Terminology as Generally Understood in the Particular Trade or Business.

27197420.1

The District Court began its analysis of the interpretation of the Exclusive Bottling Appointments by quoting the correct standard under New York law. "'An ambiguity exists where the terms of the contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business.' *British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003)(internal quotes omitted)." (Add.13) See also *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010) (internal quotation marks and citation omitted); *Broder v. Cablevision Sys. Corp.*, 418 F.3d 187, 197 (2d Cir. 2005); *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.*, 345 F.3d 154, 184 (2d Cir. 2003); *Morgan Stanley Grp., Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000). Inexplicably, the District Court then failed to follow this standard, both by ignoring the multiple possible meanings for the exclusivity provisions in the context of the entire integrated agreement, and in refusing to consider the "customs, practices, usages and terminology as generally understood in the particular trade or business" – here, the soft drink bottling industry.

1. PepsiCo Admitted That "As It's Exclusive Bottler" Suggests More Than One Possible Meaning

The District Court rejected Northern's argument that the exclusivity provision means that PepsiCo has granted Northern an exclusive territory that PepsiCo will

protect from invasion by unauthorized distributors by a simplistic focus on the absence of the word "transshipment" without any examination of what the grant of exclusivity does mean. One who is cognizant that "transshipment" in the soft drink bottling industry means unauthorized distribution invading a territory in which one bottler was granted the exclusive right to distribute, understands that an exclusive territory is meaningless without obligations to police and protect that exclusivity.

The District Court concluded, without any analysis, that the exclusivity language means, "expressly and unambiguously" that "the EBAs prohibit PepsiCo from appointing another bottler to bottle and distribute PepsiCo CSDs within Northern's territory." However, PepsiCo had acknowledged in its motion for summary judgment that the "exclusive bottler" language has several possible interpretations. DC-ECF Doc. 88, p. 30. PepsiCo stated, "[a]t most, the exclusivity provisions of the EBA *might* be interpreted as prohibiting PepsiCo from appointing another bottler to operate in Northern's territory, *or* from selling the products that are the subject of the EBAs in that territory." *Id*. (emphasis added). PepsiCo did not say which of these two admittedly possible meanings the language "unambiguously" means. Nonetheless, the District Court concluded it only meant the first – that PepsiCo may not appoint another bottler to bottle and distribute in the same territory. (Add.14).

27197420.1

PepsiCo and the District Court both heavily relied on *Compania Embotelladora Del Pacifico, S.A. v. Pepsi Cola Co.*, 650 F. Supp. 2d 314, 322 (S.D.N.Y. 2009) (hereinafter "CEPSA"), a decision from the Southern District of New York involving a Peruvian Pepsi bottler. They rely on the *CEPSA* decision to support their determination that Northern's EBA is not ambiguous and does not impose any duty on PepsiCo to prevent transshipping, despite the fact that the *CEPSA* court actually discussed four possible reasonable interpretations of the language. The judge in *CEPSA* reasoned that the exclusivity provision could mean at least four different things, or some combination thereof: (1) PepsiCo cannot appoint "another bottler" in the territory; (2) PepsiCo cannot sell "directly" into the territory; (3) PepsiCo must "prevent other bottlers" from selling into the territory; and (4) PepsiCo must prevent "third parties" from selling into the territory. *CEPSA*, 650 F. Supp. 2d at 323. (DC-ECF Doc. 88, pp. 29-30).

The *CEPSA* court then concluded, without offering any contract-based rationale, that the exclusivity provision meant the first two possible meanings – that PepsiCo cannot appoint another bottler in the territory, and PepsiCo itself cannot sell directly into the territory. Id. The court did not point to any language in the Exclusive BA that supports the conclusion that being appointed PepsiCo's "exclusive bottler"

27197420.1

protects the bottler from the first two infringements upon exclusivity but not the latter two.[4]

The lower court here, after citing to the *CEPSA* decision which identified at least four possible reasonable meanings, provided no contract-based rationale for determining that the exclusivity promise only protects Northern from having PepsiCo appoint another bottler in the same territory – only the first of the two meanings adopted by the *CEPSA* court – or for summarily concluding that the Exclusive BA is unambiguous. Multiple possible reasonable interpretations of the same language is the hallmark of ambiguity. The PCBA and its bottlers support Northern's conclusion that the EBA protects bottlers from all four types of

_____

[4] The CEPSA decision is a weak ruling that should not be followed here for several reasons. The *CEPSA* court did not even mention the 10th Circuit decision in *Pittsburg Pepsi*. In addition, the court did not have the benefit of amicus briefs providing perspective on the surrounding circumstances and devastating adverse impact if its ruling was misinterpreted as applying to US bottlers. The court's grant of summary judgment was also premised on the Plaintiff's failure to prove damages. 650 F.Supp.2d at 322. PepsiCo does not claim that Northern is unable to prove damages. Finally, the decision is on appeal to the Second Circuit.

infringement on its exclusivity. However, at a minimum, the language must be found to be ambiguous.

2. The Court Should Have Considered Evidence of the Customs, Practices, Usages and Terminology as Generally Understood in the Soft Drink Bottling Industry.

Under New York law, the court should determine the intent of the parties by examining the entire contract and giving meaning to each provision. *Chapman v. N.Y. State Div. for Youth*, 546 F.3d 230, 236 (2d Cir. 2008) (citation omitted). In interpreting a contract, the court must first determine whether the contract is ambiguous; in doing so it may consider evidence of trade practice and custom. *See Sompo Japan Ins. Co. of Am. v. Norfolk S. Ry. Co.*, 762 F.3d 165, 180 (2d Cir. 2014) ("Evidence of trade practice and custom may assist a court in determining whether a contract provision is ambiguous in the first instance."; citing *Kerin v. U.S. Postal Serv.,* 116 F.3d 988, 992 (2d Cir.1997); *Kerin*, 116 F.3d at 992, n.2 .

As discussed above, the test under New York law for determining whether contract language is ambiguous actually compels the court to view the terms from the viewpoint of "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *British Int'l, supra*. It should be self-evident that the court cannot examine the meaning of an agreement from the viewpoint of someone who is cognizant of the

customs, practices, usages and terminology of the industry, without itself considering evidence of those customs, practices, usages and terminology. *Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. N.Y. 2010) ("Evidence as to [ ] custom and usage is to be considered by the court where necessary to understand the context in which the parties have used terms that are specialized.*"); see also Sompo*, 762 F.3d at 180 ("Terms that have an apparently unambiguous meaning to lay persons may in fact have a specialized meaning in a particular industry.") (internal citations omitted); *FCCD Ltd. v. State St. Bank & Trust Co.*, No. 10 Civ. 1632 (DLC), 2011 WL 519228, at *5-6 (S.D.N.Y. Feb. 15, 2011) (evidence as to standard industry practice properly considered in making the threshold ambiguity determination with respect to the disputed language); *Int'l Multifoods Corp. v. Commercial Union Ins. Co.*, 309 F.3d 76, 87, fn. 4 (2d Cir. 2002) ("[W]e note parenthetically that the District Court erred in declining to consider the custom and usage evidence that was offered by the parties as part of its assessment of whether an ambiguity existed.").

New York law also requires the Court to interpret the relevant language in the context of the entire agreement. "'Contracts are not to be interpreted by giving a strict and rigid meaning to general words or expressions without regard to the surrounding circumstances or the apparent purpose which the parties sought to accomplish.'" *William C. Atwater & Co., Inc. v. Panama R. Co.*, 246 N.Y. 519,

524, 159 N.E. 418 (N.Y. 1927) (quoting *Robertson v. Ongley Elec. Co.*, 146 N.Y. 20, 24, 40 N. E. 390, 391 (N.Y. 1895); and citing *Gillet v. Bank of Am.*, 160 N.Y. 549, 556, 55 N. E. 292 (N.Y. 1899). "The court should examine the entire contract and consider the relation of the parties and the circumstances under which it was executed. Particular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby. Form should not prevail over substance, and a sensible meaning of words should be sought." *Id*.

## II. THE DISTRICT COURT ERRED BY REFUSING TO CONSIDER EXTRINSIC EVIDENCE TO DETERMINE THE MEANING OF THE AMBIGUOUS EXCLUSIVE BAs.

The term "exclusive" as used in the Exclusive BA is a commonly understood and regularly used term in the soft drink bottling and distribution industry. Following New York law, evidence of industry custom and usage should be considered when interpreting the appointment of a soft drink bottler as the "exclusive bottler" of the licensor. That evidence of industry custom and usage, including as explained in PepsiCo's sworn testimony before the FTC and Congress, as well as PepsiCo's own enforcement actions and court proceedings, demonstrate that the parties understood that the appointment "as its exclusive bottler" to bottle and distribute licensed soft drinks in a defined territory "and nowhere else" granted an exclusive and protected

27197420.1

territory that obligates PepsiCo to act to protect the bottler's exclusive territory from invasion through transshipment.

Applying these rules of contract interpretation will lead a "reasonably intelligent person" who has "examined the context of the entire agreement" and is "cognizant of the customs, practices, usages and terminology" of the soft drink industry, to the conclusion that PepsiCo's grant of the exclusive right to bottle and sell PepsiCo beverages within a defined territory, and prohibition against bottling and selling the beverages outside that territory, expressly imposes a duty on PepsiCo to protect Northern from invasion from any source. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.*, 431 F.3d 1241, 1259 (10th Cir. 2005); See also *Pamado, Inc. v. Hedinger Brands, LLC*, 785 F.Supp.2d 698 (N.D. Ill. 2011).

The 10th Circuit reviewed an EBA identical in all material respects with Northern's EBA and held that PepsiCo has a duty to protect its US bottlers from third party transshipment. *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. PepsiCo, Inc.* ("Pittsburg Pepsi"), 431 F.3d 1241, 1248 (10th Cir. 2005). PepsiCo appointed the plaintiff Pittsburg Pepsi as "its exclusive Bottler" for certain counties in Kansas and Missouri. Pittsburg Pepsi sued PBG (another Pepsi bottler) and PepsiCo, alleging, among other claims, that PepsiCo failed to prevent PBG from transshipping product into its exclusive territory. Applying New York law, the Tenth Circuit held:

PepsiCo must refrain from conduct that creates an unreasonable risk that it will generate transshipments into Pittsburg Pepsi's territory unless it also polices the matter to deter transshipments.

We conclude – based both on the original EBA's text, parties' subsequent actions, and the implied covenant of good faith and fair dealing – that PepsiCo had a duty to take reasonable steps to prevent competing bottlers from encroaching on Pittsburg Pepsi's exclusive territory.

. . . .

We therefore conclude the EBAs required PepsiCo to protect Pittsburg Pepsi's territory . . . . *Id*. at 1259-60.

The 10th Circuit recognized transshipments could cause the franchise to "become worthless." *Id*. at 1259.

The 10th Circuit examined the same Exclusive BA as Northern's Exclusive BA. That court had the benefit of a full record as to the industry custom and usage and decades of performance by the parties. Certainly, the 10th Circuit is, in the words of the 2d Circuit in *Law Debenture Trust, supra*, "a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." This Court should follow the 10th Circuit and similarly hold that the Exclusive BA obligates PepsiCo to protect the bottler's exclusive territory from transshipment.

The District Court recognized that the Tenth Circuit in *Pittsburg Pepsi* analyzed a "materially similar EBA" and the same legal claims for breach of contract and breach of the implied covenant of good faith and fair dealing that Northern has

27197420.1

asserted here. (Add.15) Nonetheless, the District Court declined to follow the holding of *Pittsburg Pepsi,* on the basis that the Tenth Circuit had based its holding on a finding that the EBAs were governed by the UCC rather than New York common law. (Add.16).

The PCBA agrees with Northern's analysis that the New York UCC does in fact apply to the Exclusive BAs. But even if New York common law, and not the UCC, applies to the interpretation of the contract, extrinsic evidence should still be considered, both to determine if the contract terms are ambiguous, and then to interpret their meaning once the threshold determination of ambiguity has been made.

Significantly, the UCC/common law debate has no bearing on *Pittsburg Pepsi's* analysis of the covenant of good faith and fair dealing; this covenant is implied under both New York's common law and the UCC. *Compare Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995) *with* N.Y. U.C.C. §1-304 ("Every contract or duty within this act imposes an obligation of good faith in its performance and enforcement."). The 10th Circuit's analysis of the implied covenant of good faith and fair dealing relied on New York common law, not the UCC. *Pittsburg Pepsi.*, 431 F.3d at 1260-62 (citing *Dalton*, 663 N.E.2d 289; *Don King Prod., Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990)). Certainly, a court

always considers extrinsic evidence to evaluate whether a party has complied with the covenant of good faith and fair dealing.

## III. THE DISTRICT COURT ERRED IN REJECTING NORTHERN'S CLAIM OF BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING WITHOUT TRIAL.

The District Court acknowledges that every contract governed by New York law contains an implied covenant of good faith and fair dealing.[5] (Add.17); *Dalton v. Educ. Testing Serv.*, 663 N.E.2d 289, 291 (N.Y. 1995). It is axiomatic that the covenant of good faith and fair dealing is violated where a contracting party (i) prevents the other party from carrying out its part of the agreement, *Carvel Corp. v. Diversified Mgmt. Grp. Inc.*, 930 F.2d 228, 230 (2d Cir. 1991) or (ii) deprives the other party of the right to receive the benefits of the agreement, *Don King Prod., Inc. v. Douglas*, 742 F. Supp. 741, 767 (S.D.N.Y. 1990); *accord, PepsiCo, Inc. v. Cent. Inv. Corp., Inc.*, 268 F.Supp.2d 963 (S.D. Ohio 2001) (denying PepsiCo's motion for summary judgment on bottler's counterclaim for breach of the implied duties of good faith and fair dealing, finding questions of fact existed as to whether PepsiCo had acted to deprive the bottler of the benefits of its appointments).

---

[5] In at least three cases, PepsiCo has predicated claims against its bottlers upon the good faith and fair dealing obligations implied in its bottler agreements. *PepsiCo., Inc. v. Cent. Inv. Corp.*, 271 F.Supp. 2d 1040, 1055-56 (S.D. Ohio 2001); *PepsiCo, Inc. v. Marion Pepsi-Cola Bottling Co*., (N.D. Ill. Complaint, June 14, 1999); *Mahaska Bottling Company, Inc. v. PepsiCo, Inc.*, PepsiCo's Answer to Second Amended Complaint and PepsiCo's First Amended Counterclaims (S.D. Iowa, February 8, 2018).

27197420.1

"The covenant is violated when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement." *Geren v. Quantum Chem. Corp.,* 832 F. Supp. 728, 732 (S.D.N.Y. 1993), *aff'd*, 99 F.3d 401 (2d Cir. 1995), quoting *Don King Prods.*, 742 F. Supp. at 767. The implied covenant of good faith and fair dealing is defined by the reasonable expectations of the parties in entering the contract. *Cross & Cross Props. v. Everett Allied Co*., 886 F.2d 497, 502 (2d Cir. 1989).

The District Court erred in holding that, since it had already decided (incorrectly) that the EBAs do not impose any affirmative duty on PepsiCo to protect the exclusive territory provided therein, the implied covenant of good faith and fair dealing cannot be used to create a new affirmative duty that is not contained in the contract. (Add.18). The District Court relies primarily on the flawed lower court decision in CEPSA in dismissing Northern's implied covenant claim without permitting a jury to weight the facts.[6]

---

[6] The *CEPSA* ruling is faulty and should not be followed. The Plaintiff in *CEPSA* had not properly alleged a claim for breach of the implied covenant of good faith and fair dealing in its pleadings. 650 F.Supp.2d at 324. PepsiCo concedes that Northern has alleged an implied covenant claim. DC-ECF Doc. 88 at 31. Also, the

PepsiCo, by its failure to act to protect Northern against invasion by unauthorized distribution, has deprived Northern of the right to receive the benefits of its exclusive territory—rights that are expressly granted by the EBA. This same failure has also prevented Northern from carrying out its express obligations under the EBA, including the duty to "secure full distribution" to "meet and increase demand" within its territories. Invocation of the implied covenant would not create new duties that are not found in the contract.

Further, a claim for breach of the implied covenant of good faith and fair dealing does not require the claimant to first prove a breach of contract. Rather, "breach of the covenant of good faith and fair dealing occurs [ ] where the contract is not technically breached, but one party has acted to destroy or injure the right of

---

*CEPSA* court held (erroneously) in a previous Order that *CEPSA's* EBA was terminable at will, and then found that there may be no implied covenant of good faith and fair dealing in a contract terminable at will. 650 F.Supp.2d at 603. Northern's EBA is not terminable at will. Another reason to distinguish *CEPSA* is that PepsiCo, through PBC, is the producer and initial seller of most of the product transshipped into Northern's territory. PepsiCo was not the source of the transshipped product in *CEPSA*.

27197420.1

the other party to receive the benefit of the contract." *Witherspoon v. Rappaport*, 65 Fed. App'x 356, 359 (2d Cir. 2003).

A violation of the covenant "need not involve the breach of an express contractual provision. Instead, the covenant of good faith and fair dealing is breached 'when a party to a contract acts in a manner that, although not expressly forbidden by any contractual provision, would deprive the other of the right to receive the benefits under their agreement.' *Don King Productions, Inc.*, 742 F. Supp. at 767; *Bank of China v. Chan*, 937 F.2d 780, 789 (2d Cir. 1991) (the implied covenant is "violated when a party 'acts so directly to impair the value of the contract for another party that it may be assumed that [its actions] are inconsistent with the intent of the parties' or when the action 'directly violate[s] an obligation that falls within their reasonable expectations.'" *Id.*

PepsiCo's failure to protect Northern's exclusive territory from invasion is "inconsistent with the intent of the parties" and violates an obligation "within their reasonable expectations." As PepsiCo itself claimed in the *Fritz Bottling* case, discussed in the Historical Background section above, where invasion by unauthorized bottlers is permitted, the invaded bottlers do not receive an exclusive territory, which is "essential to the mutual objectives of PepsiCo and its bottlers." DC-ECF Doc.96-3.

27197420.1

Failing to protect a bottler from product invasion prevents the bottler from carrying out its part of the agreement. The EBAs require bottlers to "secure full distribution" within the exclusive territory. DC-ECF Doc. 1-1, Page 2, ¶ 8. Invasions prevent that performance. Invasions prevent a bottler from receiving the benefit of its investment and effort. Instead, the transshipping bottler obtains a free ride on that investment and effort.

PepsiCo's failure to act prevents a bottler from receiving the benefit of its investment and effort. *See Scheck v. Burger King Corp.*, 756 F.Supp. 543, 549 (S.D. Fla. 1991) (under Florida law, franchisee was entitled to expect franchisor would not destroy franchisee's right to enjoy fruits of its contract and covenant of good faith and fair dealing may have been breached by franchisor, despite lack of exclusive territory, opening another restaurant less than two miles away.

The facts of this case fit the paradigm for the application of the covenant of good faith and fair dealing. PepsiCo has made an express promise that Northern would be "its exclusive bottler" in the territory. The duty of good faith and fair dealing requires PepsiCo to act so as not to undermine the value of its promises to "its exclusive bottlers." PepsiCo has a duty to govern itself so as not to undermine the value of its grant of exclusivity.

The Tenth Circuit correctly ruled that the implied covenant applies to PepsiCo's EBAs and supports PepsiCo's duty to protect against transshipments.

27197420.1

*Pittsburg Pepsi,* 431 F.3d at 1261-62. The Court found "[t]ransshipments could undermine the value of" the franchise—the very outcome the implied covenant is designed to prevent. *id*. at 1259.

## CONCLUSION

The district court committed multiple errors in its attempt to apply New York law, and has created a situation where inconsistent legal standards may apply to different Pepsi bottlers with identical contracts based solely on what jurisdiction adjudicates their claims. The PCBA urges this this Court to reverse summary judgment and remand for trial.

Respectfully submitted this 7th day of May, 2020.

TAFT, STETTINIUS & HOLLISTER, LLP
/s/ Marcia V. Andrew
Marcia V. Andrew
Walnut Street, Suite 1800
Cincinnati, OH 45202
Telephone: (513) 381-2838
andrew@taftlaw.com
ATTORNEY FOR AMICUS CURIAE
PEPSI-COLA BOTTLERS'
ASSOCIATION

27197420.1

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. 32</u>

This document complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) and 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P.32(f):

This document contains <u>6,439</u> words.

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

This document has been prepared in a proportionally spaced typeface using Microsoft Word <u>2016</u> version <u>1910</u> in 14 point Times New Roman.

This document complies with 8th Cir. R. 28A(h)(2) because it has been scanned for viruses and is virus fee.

Dated: May 7, 2020        <u>/s/ Marcia V. Andrew</u>
Marcia V. Andrew

27197420.1

## CERTIFICATE OF VIRUS FREE

Pursuant to Local Rule 28A(h)(2) of the Eighth Circuit Rules of Appellate Procedure, the undersigned counsel hereby certifies that this brief has been scanned for computer viruses and is virus free.

Dated:  May 7, 2020         /s/ Marcia V. Andrew
                                        Marcia V. Andrew

27197420.1

## **CERTIFICATE OF SERVICE**

I hereby that on May 7, 2020, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

/s/ Marcia V. Andrew
Marcia V. Andrew

27197420.1